| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
| OFFIT KURMAN, P.A.<br>By: Paul J. Winterhalter, Esquire (006961986)<br>     Augustus T. Curtis, Esquire (pro hac vice pending)<br>Court Plaza South<br>21 Main Street, Suite 158<br>Hackensack, NJ 07601<br>Telephone: (267) 338-1370<br>Facsimile: (267) 338-1335<br>E-mail: pwinterhalter@offitkurman.com | |
| In re:<br><br>BAKER & TAYLOR, LLC,<br><br>                    *Debtor*. | Chapter 11<br><br>Case No. 26-12863 (CMG)<br><br>Judge: Christine M. Gravelle |

**DECLARATION OF AMANDEEP KOCHAR IN SUPPORT OF
THE CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Amandeep S. Kochar, being duly sworn, depose and say:

1.     I serve as the Chief Executive Officer of Baker & Taylor, LLC ("Baker & Taylor" or the "Debtor"), the above-captioned debtor in this chapter 11 case (the "Bankruptcy Case"). I am over 21 years of age and am competent to make this declaration ("Declaration"). If called upon to testify, I would testify competently to the facts set forth in this Declaration and that I am authorized to submit this Declaration on behalf of Baker & Taylor.

2.     On March 16, 2026 (the "Petition Date"), Baker & Taylor commenced the above-captioned case under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), seeking to complete the orderly liquidation of its assets under the protection and approval of the Bankruptcy Court.

3.      I make this Declaration in support of the petition, to provide the Court and parties in interest with an overview of Baker & Taylor's business and the events precipitating the commencement of this Bankruptcy Case, and in support of the relief being sought in certain "first day" motions and applications (the "First Day Motions") filed on the Petition Date. This Declaration is based on my first-hand knowledge of Baker & Taylor's operations as well as information provided to me by its employees. I have, to the best of my knowledge and ability, submitted all facts as true based on my review of relevant data and documents and consultation with Baker & Taylor's officers, employees, and professionals.

## A.      Historical Background and Business Operations of Baker & Taylor

4.      Baker & Taylor was founded in 1828 as a local book supplier in Hartford, Connecticut. Over more than a century, the company grew into one of the largest book distributors in the United States. By the latter part of the 20th century, Baker & Taylor was a leading global provider of English language books, media, software and services, primarily to public and academic libraries in the United States. Baker & Taylor and its affiliates[1] provided top quality books and media resources from book publishers to thousands of libraries, universities and other public and private customers across the United States and elsewhere.

5.      From 1994 to 2016, Baker & Taylor was owned by a consortium of private equity parties including Castle Harlan Partners ("Castle Harlan"). During these years, despite its leading position in the book distribution industry, Baker & Taylor faced mounting economic challenges common to book and media publishers and distributors. From the mid-1990s forward, a number

---

[1] I have attached as Exhibit "A" to this Declaration a corporate organization chart showing the Baker & Taylor's affiliated entities, including BTAC Holding Corp. ("BTAC Holdings"), BTAC Acquisition Holdings, LLC ("Intermediate Holdings"), BTAC United Acquisition Holding Company ("Ultimate Holdings"), and Bookmasters, Inc. ("Bookmasters" and with B&T, B&T Holdings, Intermediate Holdings, and Ultimate Holdings, collectively "Baker & Taylor" or the "Debtors").

of structural hurdles to profitability increasingly impacted the company, including declining book sales, concerns about the future of physical books, and the nascent digital revolution.

6.      In 2016, Castle Harlan sold its interests in Baker & Taylor to the Follett Corporation ("Follett"). Follett operated Baker & Taylor for approximately five years, but unfavorable economic trends continued, and the advent of the COVID-19 pandemic further damaged Baker & Taylor's prospects. In 2021, Follett sought to divest from multiple content and distribution divisions, including Baker & Taylor.

   i.   *Baker & Taylor's Acquisition by Current Ownership.*

7.      On November 4, 2021, Follett sold Baker & Taylor to a group of officers and directors led by myself (the "2021 Acquisition").[2] To finance the acquisition, Baker & Taylor and its affiliated entities entered into a Loan, Security and Guarantee Agreement (the "Credit Agreement") with CIT Northbridge Funding I, LLC ("CIT"), through which CIT granted Baker & Taylor a credit facility (the "CIT Credit Facility") of up to $70 million to acquire and operate the business.

8.      After the 2021 Acquisition, Baker & Taylor was well-positioned to recover from the pandemic and complete its adaptation to contemporary market conditions. Unfortunately, however, events unforeseen at the time of the 2021 Acquisition crippled its recovery and severely impaired liquidity. First, Baker & Taylor's operations were impacted in early 2022 by the emergence of the COVID-19 "Omicron" variant, which caused renewed fears of the virus' spread, significantly lowered the purchasing appetite of customers, and dramatically increased

---

[2] In the transaction, Follett conveyed its 100% equity interest in Baker & Taylor's parent, BTAC Acquisition Holdings, LLC, to BTAC United Acquisition Holding Company ("Ultimate Holdings"), a company organized by the owner group to hold the equity of Baker & Taylor and its affiliated entities. I acquired, and now hold, 96.1 percent of the issued and outstanding shares of Ultimate Holdings. I have attached a Corporate Organization Chart showing the current structure of the Baker & Taylor business entities under the ownership of Ultimate Holdings.

payroll costs and crippled warehouse efficiency. Second, two major cyberattacks in August and November, 2022 severely impaired Baker & Taylor's operations, accounting and technology systems, further reducing liquidity draining cash resources.

> *ii.     Baker & Taylor's Efforts to Recapture Liquidity Position and Increase Operational Profitability.*

9.     These setbacks placed Baker & Taylor in a severe liquidity problem. The 2022 decline in accounts receivable eroded the company's borrowing base under the CIT Credit Facility and impaired access to capital to purchase fresh inventory. To address this challenge, Baker & Taylor began a series of steps in 2022 to increase liquidity, including efforts to monetize real property assets through the sale/leasebacks of real property assets, offshore and automate warehouse and administrative functions, and divest from certain overseas divisions of the company.

10.     In August 2023 and March 2024, Baker & Taylor consummated sale/leaseback transactions of its two warehouse fulfillment centers, located in Commerce, Georgia and Momence, Illinois (collectively, the "Fulfillment Centers"). Through these transactions, the company preserved the operational value of the Fulfillment Centers while generating approximately $26 million in proceeds to pay down the CIT Credit Facility.

11.     In 2023, Baker & Taylor executed plans to offshore administrative functions and automate warehousing processes. Baker & Taylor historically conducted certain international operations through separate legal entities organized under the laws of foreign jurisdictions, including subsidiaries located in the United Kingdom and India, and the company created a new wholly-owned subsidiary in 2022, Baker & Taylor IT Services India Private Limited ("B&T

India") to house certain marketing, human resources, finance, sales and IT functions.[3] It also commenced efforts to automate physical distribution in its Fulfillment Centers. Both of these efforts were intended to lower costs in 2024 and 2025 by shrinking Baker & Taylor's operating expenses and improving cash flow.

12.     In 2025, Baker & Taylor also divested two overseas operating businesses, James Bennett Pty Ltd. ("James Bennett") and Bridgeall Libraries, Ltd. ("Bridgeall"). James Bennett is Australia's foremost supplier of books and media to libraries and provides print and digital acquisitions and collection development services, and Baker & Taylor consummated the sale of its equity interests in James Bennett to Booktopia Holdings Pty Ltd. ("Booktopia") on May 15, 2025.[4] Bridgeall sold its assets, principally including its "Collection HQ" book subscription business, to Valsoft Ireland Limited and Valsoft Scotland Limited (together, "Valsoft") under a June 17, 2025 Asset Purchase Agreement, while Baker & Taylor entered into a Sales Representation Agreement under which Baker & Taylor acted as a third-party reseller for CollectionHQ and related products and services. From the James Bennett and Valsoft transactions, Baker & Taylor paid an additional $16 million on the CIT Credit Facility in May and June, 2025.

   iii.     *Default and Restriction of the CIT Credit Facility.*

13.     These liquidity measures were intended to reduce the balance of the CIT Credit Facility and provide Baker & Taylor with borrowing capacity to purchase inventory to service customer demand. Aging inventory depressed Baker & Taylor's borrowing base under the CIT Credit Facility, perennially starving the company of liquidity to pay down balances due to its

---

[3] These entities are not debtors in this chapter 11 case.

[4] In the transaction, Baker & Taylor conveyed its equity interest in Blackwell Pacific Pty Ltd. ("Blackwell"), the sole parent of James Bennett, to Booktopia.

major publisher vendors and thereby obtain trade credit for new purchases. While the company's measures were calculated to reduce the company's position with CIT and make new credit available, however, intervening developments in Baker & Taylor's credit relationship with CIT frustrated this purpose.

14.      In late April 2025, CIT issued a Notice of Event of Default and Reservation of Rights (the "CIT Default Notice") under the Credit Facility, asserting Baker & Taylor was in default for failing to maintain a required "Fixed Charge Coverage Ratio" under the CIT Credit Facility. CIT reserved all rights under the facility and specifically disclaimed any obligation to make further funding available. As CIT held all Baker & Taylor operating revenues in one or more "lockbox" accounts, this meant that Baker & Taylor had no access to capital to pay even its ordinary operating expenses, absent CIT's discretionary decision to fund such expenses. As a result of these arrangements, CIT effectively controlled the Debtor's liquidity and had the ability to determine which operating expenses would be funded during the wind-down process.

15.      The CIT Default Notice had a second consequence. Upon payment of the proceeds from the Collections HQ and James Bennett transactions, CIT unilaterally reduced Baker & Taylor's credit availability by executing a "lock up" of $8 million in available credit at this critical juncture. Baker & Taylor sought to negotiate a "lift" the $8 million "lock up," but though CIT continued to fund expenses on a discretionary basis, it declined to lift the $8 million restriction. Critically, this meant that Baker & Taylor could not reduce balances due to publishers. Despite Baker & Taylor's consistent and transparent discussions with its trade creditors, in July and August, 2025, trade creditors began to withhold further shipments to Baker & Taylor, leaving the company unable to fulfill customer orders and causing critical liquidity problems.

16.     Baker & Taylor's critical problems in 2025 were made worse by litigation initiated against the company by OCLC, Inc. ("OCLC"), a nonprofit library cooperative based in Dublin, Ireland. On March 26, 2025, OCLC filed suit against Baker & Taylor and Bridgeall in the United States District Court for the Southern District of Ohio, alleging that Baker & Taylor and Bridgeall wrongfully used certain data of "WorldCAT," a library information platform operated by OCLC, in developing a competing platform. While Baker & Taylor vigorously defended against the OCLC allegations, the onset of the litigation added substantial costs to the already fragile cash flow picture faced by the company.

17.     In August, 2025, it became apparent that without new capital, the deterioration of Baker & Taylor's relationships with CIT and publishers, together with the OCLC litigation, would present an insurmountable challenge to continuing business operations. Baker & Taylor quickly pivoted to efforts to secure new financing to replace CIT, including by reaching out to trade creditors for strategic capital investment, and began exploring alternatives for sale of the company. Baker & Taylor retained a financial advisor, Riveron RTS, LLC ("Riveron"), to assist with strategies to address these challenges. Baker & Taylor initially engaged Riveron to assist in evaluating restructuring alternatives, including raising new debt or equity capital to sustain operations, pursuing a potential sale of the company's business and assets, and, if those alternatives were unsuccessful, assisting with an orderly wind down and liquidation to maximize recoveries for secured and unsecured creditors.

18.     Together with Riveron, Baker & Taylor began a process to obtain financing or an asset purchaser for Baker & Taylor. Over the following months, I worked closely with Riveron's advisory team, often multiple times per day, regarding operational decisions, asset sales, and financing alternatives. I also communicated regularly with representatives of CIT, sometimes

several times each week, particularly when approval was required for transactions involving collateral or lien releases.

19. The goal of these efforts was either to obtain operational funding or, if that proved impossible, to arrange sales of Baker & Taylor's assets in order to maximize recovery for creditors. That remained my overriding purpose throughout the months prior to the filing of the Bankruptcy Case, and I worked closely with the company's advisors, including Riveron, to achieve this goal.

20. Together with Riveron, Baker & Taylor first sought to obtain new debt or equity financing to take out or supplement its position with CIT. Working with Riveron, the company identified 41 potential financing sources, and received 27 expressions of interest from potential counterparties. Ultimately, 5 parties executed term sheets for potential transactions and engaged in due diligence efforts with the company. Despite intensive efforts by management and Riveron, however, Baker & Taylor was unable to negotiate financing to provide new liquidity.

*iv.    The ReaderLink Transaction.*

21. In mid-August, 2025, Baker & Taylor began exploring potential asset sale transactions. On September 6, 2025, Baker & Taylor, in cooperation with CIT, executed a letter of intent with ReaderLink, LLC ("ReaderLink") by which ReaderLink would purchase substantially all of Baker & Taylor's and its affiliates' assets through a private sale under Article 9 of the Uniform Commercial Code. The parties began financial due diligence, communications with the largest trade creditors, and drafting of dispositive transaction documents with the intention of closing the transaction on or before September 26, 2025.

22. Among other terms, the parties agreed that ReaderLink would, upon closing, employ approximately 700 of Baker & Taylor's approximately 950 employees as ReaderLink

employees. All other Baker & Taylor employees would continue to be employed by Baker & Taylor to provide services under a Transitional Services Agreement ("TSA") to last through the end of calendar year 2025. The parties began negotiation of the TSA, and ReaderLink extended employment offers to approximately 700 employees it intended to transition to employment with ReaderLink.

23.     By September 26, 2025, the parties had completed due diligence and exchanged drafts of the transactional documents. However, on the morning of September 26th, ReaderLink announced that it was withdrawing its offer to purchase Baker & Taylor's assets and rescinded the employment offers to Baker & Taylor employees.

*v.*     *Baker & Taylor's Wind Down Efforts.*

24.     The failure of the ReaderLink transaction left Baker & Taylor with no realistic means to continue its operations. The company had no access to further CIT borrowing except on a discretionary basis and no prospect of new capital or a purchaser for its assets. As a result, while the company continued urgent efforts to find a new purchaser, it had no choice but to begin curtailing its operations and crafting a plan for an orderly wind down of its business.

25.     Among other concerns, the failure of the ReaderLink transaction caused an immediate inability to continue the employment of Baker & Taylor's full workforce, as CIT would not exercise discretion to continue funding the full workforce in a wind down budget. As a result, after discussions with CIT and with CIT's cooperation, Baker & Taylor on October 6, 2025 separated approximately 600 of its 950 employees from employment and provided notice to most remaining employees that their employment would end at scheduled times thereafter as Baker & Taylor completed its wind down. In addition, at approximately the same time as it separated the bulk of its workforce, Baker & Taylor was forced to terminate self-funded health

-9-

insurance and profit sharing plans with its employees and to discontinue severance packages available to employees.

26.     These workforce reductions were undertaken only after the collapse of the ReaderLink transaction and under significant financial constraints imposed by CIT, which exercised control over the company's liquidity through lockbox arrangements and account control agreements. These decisions were made in consultation with advisors and were driven by the necessity of preserving remaining value for creditors while the company pursued potential asset sales and other restructuring alternatives.

27.     Baker & Taylor also began urgent efforts to divest discrete parts of its and its affiliates' assets and operations. With Riveron's assistance, Baker & Taylor identified potential purchasers for discrete business components:

(a)     Baker & Taylor Publisher Services ("BTPS"). BTPS was a self-contained business division which provided publishing services and digital and physical book production, including printing and binding, print book warehousing and distribution, eBook conversion and distribution, and editorial and design services to publishers. Operations of BTPS were principally housed in Bookmasters, Inc. an Ohio corporation affiliated with Baker & Taylor.

(b)     Digital Publishing business ("Digital Pub"). Digital Pub was operated by Baker & Taylor to provide access to e-books and e-audio books as a wholesaler to public library customers via a digital application.

(c)     CamCat Publishing ("CamCat"). CamCat was a Baker & Taylor division which provided publishing and publisher services to certain individual book publishers, principally of children's books and media.

28.     In addition, Baker & Taylor employed a liquidator, Great American Holdings, LLC ("GA Group"), to develop a plan for liquidating its inventory of books and media.

29.     While Baker & Taylor took these initial steps toward winding down its operations, management continued to pursue other alternatives to produce the best possible outcome for creditors. Baker & Taylor approached several of its largest trade creditors to explore

the possibility of rescue capital or strategic investment that could stabilize operations or support a sale of the business. In addition, the company received a confidential term sheet from a publicly traded strategic buyer in mid-October 2025, expressing interest in acquiring a substantial portion of the remaining operations. Management, together with Riveron, engaged with that party and disclosed the potential transaction to several of Baker & Taylor's largest trade creditors in an effort to secure support for the proposed transaction. Despite extensive discussions and due diligence, the proposed transaction ultimately did not proceed due to insufficient trade creditor support.

30.     With the failure of this second potential asset purchase, Baker & Taylor turned back towards a wind down of its operations. Baker & Taylor publicly announced plans to commence sales in bulk of its inventory of books and media through GA Group, accelerated its efforts to sell its BTPS, Digital Pub and CamCat-related assets and sought to liquidate contract rights and accounts receivable, all with a goal of paying out the secured CIT Credit Facility and obtaining whatever recoveries were possible for creditors.

31.     From October to December, 2025, Baker & Taylor marketed and ultimately sold its BTPS, Digital Pub and CamCat-related assets. On November 21, 2025, Baker & Taylor and Bookmasters consummated the sale of the assets of the BTPS division to LSC Communications Book LLC, d/b/a Lakeside Book Company ("Lakeside"), and CIT issued a partial release of its liens in order to facilitate the transaction.

32.     On December 15, 2025 and December 24, 2025, Baker and Taylor consummated two asset purchase agreements regarding sales of the Digital Pub business to LibraryOne Digital, Inc. ("LibraryOne"). Again, CIT issued a partial lien release to facilitate the transaction. Under both asset purchase agreements, Baker & Taylor agreed to provide certain transitional services to

LibraryOne in connection with the transfers. Such transitional services agreements shall expire on April 30, 2026.

33.     On December 30, 2025, Baker & Taylor consummated the sale of CamCat assets to Marble Press, LLC ("Marble Press"). Under the Marble Press asset purchase agreement, Marble Press assumed the responsibility to pay all unpaid royalties owed to authors, illustrators, and other rightsholders relating to titles included in CamCat's portfolio of licensed books and content. Again, CIT issued a partial release concerning the sale.

34.     During the wind down of operations, Baker & Taylor also took steps to reduce operating costs by closing its facilities as such closure became possible. On December 31, 2025, the company vacated its Fulfillment Center in Commerce Georgia, notifying the landlord, BT Commerce Fee Owner, LLC, of its intent to surrender the facilities. Baker & Taylor also vacated a facility in Charlotte, North Carolina, notifying its landlord of its intent to surrender the facility. After vacating these facilities, Baker & Taylor retains its office location in Bridgewater, New Jersey, and its Fulfillment Center in Momence Illinois, where the remainder of its inventory is located. Shortly after the Petition Date, the company intends to remove its remaining inventory and other assets from the Momence Fulfillment Center and surrender possession of the premises to the landlord.

35.     Baker & Taylor's wind down has been plagued by significant costs relating to litigation against the company. Principally, the OCLC litigation, continues unabated. Other litigation has also plagued the wind down effort. In Illinois and Georgia, former Baker & Taylor employees filed litigation on behalf of putative classes of claimants asserting rights under the Federal WARN Act arising from their termination from employment (the "WARN Act Plaintiffs"). No class has been certified in either matter. Baker & Taylor disputes its liability on

these claims and believes it has valid defenses in the litigation.[5] Baker & Taylor also faced

further litigation and mounting demands from other creditors while its resources to contest such

matters declined.

36.     Throughout the wind down process, I and other management worked intensively

to pursue transactions which would maximize the value of the company's assets. Neither I nor

any member of management received dividends, equity distributions or other insider payments

from the company. Management's focus was on preserving the value of the business and

maximizing recovery for creditors.

37.     The proceeds generated from the wind down transactions were applied toward

repayment of the CIT Credit Facility, reducing the balance owed to the secured lender and

preserving value for the company's creditors. As a result of its liquidation efforts, Baker &

Taylor retired the full balance of the CIT Credit Facility on February 13, 2026.

38.     After retiring the CIT debt, the company continued efforts to liquidate remaining

assets, but those efforts were further hampered by new litigation filed by former employees at

Baker & Taylor's facility in New Jersey. On February 18, 2026, two former employees filed an

Individual and Class Action Complaint against Baker & Taylor, BTAC Holding Corp. and

myself, in the Superior Court of New Jersey for Somerset County, initiating the case entitled

*Carmichael, et al. v. Baker & Taylor, et al.*, Civil Action No. SOML 00023226, alleging

violation of the New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act, N.J.S.A.

34:21-1 et seq. (the "New Jersey WARN Act"). No class has been certified in the litigation. The

Debtor disputes liability and believes it has valid statutory defenses to the complaint.

---

[5] The lack of merit of the litigation is highlighted by the fact that the Illinois Department of Labor quickly dismissed an investigation of potential WARN liability after Baker & Taylor provided information concerning the circumstances leading to the terminations.

39. On March 16, 2026, Baker & Taylor filed this case. Bankruptcy was not a preferred outcome for Baker & Taylor or its management. However, after exhausting all alternatives and repaying the secured lender through asset sales, a chapter 11 filing became the only practical means of completing the liquidation process in an orderly manner and maximizing creditor recoveries.

**B. Baker & Taylor's Assets**

40. The following are Baker & Taylor's principal assets to be administered through the Chapter 11 case for the benefit of creditors: (1) accounts receivable due from libraries and other customers, (2) remaining inventory located in the Momence, Illinois Fulfillment Center, (3) certain contract rights and other rights the company holds against contract counterparties, and other assets with *de minimis* value.

41. *Accounts Receivable*. Baker & Taylor holds and collects in the ordinary course of business accounts receivable, principally from library customers. As with inventory value, the amount of accounts receivable fluctuate, however, Baker & Taylor's records indicate that the company held as of mid-February 2026 a gross balance of accounts receivable of approximately $3.4 million.

42. *Inventory.* Baker & Taylor holds a remaining inventory of books and other content in its remaining Fulfillment Center, located in Momence, Illinois. I believe the net value of this remaining inventory is likely approximately $100,000.

43. *Contract Rights.* Baker & Taylor holds rights to collect earn-out and deferred compensation amounts under certain prebankruptcy agreements, estimated to total in excess of $1 million.

44.     *Other Assets.* Baker & Taylor retains certain additional assets, including approximately $40,000 in amounts remaining due for transition services it provides to LibraryOne in connection with sale of the Digital Pub business, certain intellectual property rights and other assets with minimal value.

## C.  Baker & Taylor's Capital Structure

45.     Baker & Taylor has retired the CIT Credit Facility, its sole secured obligation. Baker & Taylor's only remaining secured obligations are long-term financing lease obligations arising from the sale/lease back transactions for the two Fulfillment Centers. Baker & Taylor's aggregate capitalized liability under the Lease Agreements for the Fulfillment Centers totals approximately $43 million. Aside from its lease rights, however, these obligations are not secured by any remaining Baker & Taylor assets.

46.     Baker & Taylor estimates it may owe between $1 and $2 million in unsecured obligations to former employees which are entitled to priority treatment under Section 507(a) of the Bankruptcy Code. Certain employees may hold priority claims for unpaid medical reimbursements under a former Baker & Taylor "self-insured" medical insurance plan terminated as part of the wind down of the company's operations in October 2025. Such claims, if allowed, may be entitled to priority up the statutory caps set forth in section 507(a)(5) of the Bankruptcy Code.

47.     Baker & Taylor disputes any liability concerning the WARN Act complaints and believes it has valid defenses to any claims by employees based on alleged violations of Federal or state WARN acts. If such claims are allowed, however, such claims may constitute further claims entitled to priority (up to the applicable statutory caps) under section 507(a)(4) of the Bankruptcy Code.

48.     Baker & Taylor believes its general unsecured obligations total approximately $120 million. These consist principally of (1) approximately $68 million in unsecured trade obligations to publishers and suppliers of book and media content, (2) approximately $33 million in obligations to library customers who participated in a Baker & Taylor leasing program by which they prepaid for books and media to be delivered by the company, but which Baker & Taylor was unable to deliver, and (3) approximately $18 million in other unsecured obligations.

## A.     **The First Day Motions**

49.     To enable Baker & Taylor to operate effectively and minimize potential adverse effects during the pendency of the Bankruptcy Case, it is requesting certain relief in the First Day Motions filed with the Court concurrently herewith. The First Day Motions seek to implement procedures that will promote a seamless transition into the Bankruptcy Case, allowing Baker & Taylor to continue to operate with existing cash and proceeds of product sales, continue to pay employees in the ordinary course of business, maintain its existing cash management systems and insurance policies, and generally to minimize any potential adverse effects on operations during the process of orderly liquidation.

50.     I believe that the relief requested in each First Day Motion is necessary to preserve and maximize the value of Baker & Taylor's estate, essential to the successful conclusion of Baker & Taylor's liquidation, and in the best interest of creditors and other parties in interest.

*i.   Motion For an Order Extending Time to File Schedules and Statements.*

51.     Baker & Taylor has filed an Application seeking an extension of the time for filing the schedules, statement of financial affairs and other documents required to be filed pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c), through and

including April 20, 2026. The Company is working diligently with Riveron to complete the

required documents, but believes the schedules and remaining documents will not be prepared

for filing by the current deadline of March 30, 2026. The company's financial information is

complex, involving nearly 2000 creditors and other parties-in-interest, over 100 contract

counterparties, and other detailed information.

52.     I believe a brief extension of the deadline will assist Baker & Taylor to provide

complete and accurate information in these required documents, and will not cause prejudice to

parties in interest in this case. I therefore support the request for an extension of time to file the

referenced documents.

ii.     *Application to Retain a Claims and Noticing Agent.*

53.     Baker & Taylor anticipates that nearly 2,000 entities and individuals will need to

be served in connection with the chapter 11 case. To assure timely, efficient noticing and

administration of claims in the case, it has filed a Motion seeking to authorize the retention of

Omni Agent Solutions ("Omni") as claims and noticing agent in accordance with 28 U.S.C.

§156(c).

54.     Baker & Taylor obtained and reviewed engagement proposals from at least three

(3) other court-approved claims and noticing agents to ensure a competitive process. Based on all

engagement proposals obtained and reviewed, Omni's rates are competitive and reasonable given

Omni's quality of services and expertise. Accordingly, I believe that approval of the retention of

Omni as Claims and Noticing Agent is in the best interests of Baker & Taylor's estate.

iii.    *Motion of the Debtor Seeking Entry of an Order Authorizing the Debtor to Redact*
        *Certain Personally Identifiable Information*

55.     Baker & Taylor has filed a motion seeking authority to redact certain personal

information of present and former employees from the public matrix filed with the Court. The

-17-

company believes redaction of employee addresses is necessary to protect such individuals' vital information from potential identity theft and threats to personal safety, and submits that redaction is authorized under the Bankruptcy Code and the Bankruptcy Rules and will not prejudice any party. I support the relief sought in the motion.

*iv.      Motion for Continuation of Cash Management Systems*

56.      Baker & Taylor has filed a motion seeking the entry of interim and final orders authorizing, but not requiring, the company to: (a) continue use of their existing cash management system by, among other things, (i) maintaining existing Bank Accounts, (ii) paying certain pre-petition charges from the accounts, including payments for general and administrative business expenses incurred in the ordinary course of business that will not include any payments made for the benefit of "insiders"; and (b) continue to use their Business Forms in the same manner in which they existed prior to the Petition Date.

57.      Baker & Taylor maintains a centralized cash management system which conformed with requirements of the former CIT Credit Facility. Baker & Taylor holds eight (8) bank accounts with Bank of America, N.A., including three (3) accounts into which institutional, retail and "key accounts" payments are received before being swept into a single "AR" account (the "Master AR Account"). In addition to these payments, the Master AR Account receives all ACH payments and wire transfers, and, through a separate "Credit Card Receipts" account funded by payments from credit card merchants, all of the company's credit card receipts. From the Master AR Account, all funds are released into an Operating Account and then into two disbursement accounts, an "AP Controlled Disbursements Account" and an "Other Disbursement Account." Substantially all of the company's payments to third parties, including publishers, suppliers, vendors and others, are processed through one of the two disbursement accounts.

58.     In addition, in the ordinary course of its business, Baker & Taylor utilizes a multitude of check types, correspondence and business forms, including, but not limited to, letterhead, purchase orders and invoices, including the distribution of various promotional materials to its customers.

59.     Baker & Taylor seeks authority to continue to use their existing accounts, maintain their current correspondence, business forms, and checks as such existed immediately prior to the Petition Date, without reference therein to Baker & Taylor's status as a debtor in possession. I believe that the relief requested in the Cash Management Motion is necessary to minimize the expense to the estate associated with obtaining new banking accounts, developing and, or, purchasing entirely new forms, and the disruptions and delays in conducting business that would flow from this process, The relief sought in the Cash Management Motion is in the best interest of the estate, its creditors, and all other parties in interest.

*v.     Application for Payment of Employee Wages and Related Compensation.*

60.     Baker & Taylor has filed an application seeking entry of interim and final orders (i) authorizing, but not requiring, payment of prepetition wages, commissions, and employee benefits, (ii) authorizing and directing banks to honor checks with respect thereto, and (iii) authorizing, but not requiring, payment of post-petition wages and employee benefits. (the "Payroll Motion").

61.     Baker & Taylor has a limited remaining workforce consisting of 19 full time employees, some of whom provide transitional services to LibraryOne in connection with the sale of the Digital Pub business. In addition, Baker & Taylor continues to employ 9 individuals as independent contractors assisting with the company's wind down of business operations. In order to assist with the orderly wind down, I intend to remain as Baker & Taylor's Chief

Executive Officer, but to economize on administrative expenses, I have agreed to provide services and retain responsibility for corporate decisions, in consultation with advisors, while reducing my compensation to 50% of my former salary, under a weekly retainer.

62.     In the Payroll Motion, Baker & Taylor seeks entry of interim and final orders (i) authorizing, but not requiring, it to pay, in its sole discretion, approximately $47,000, inclusive of prepetition wages, commissions, prepetition payroll tax obligations and payroll administration fees.  The details concerning the amounts Baker & Taylor seeks authority to pay are set forth in the Employee Wage Motion.

63.     I believe that the relief requested in the Employee Wage Motion is essential to preserve and maximize the value of the Baker & Taylor estate, and in the best interest of creditors and other parties in interest. The remaining skilled workforce is critical to Baker & Taylor's ability to navigate the challenge of liquidating under the Plan. As indicated in the Payroll Motion, only payments that fall within the limits on "priority" wage claims set forth in section 507 of the Bankruptcy Code will be authorized and may be paid to individual employees.

**B. <u>Conclusion</u>**

64.     Baker & Taylor has conducted the wind down of the company's affairs in a transparent manner, intent upon providing the maximum potential recovery for the benefit of its creditors. The chapter 11 filing, while not the desired outcome for the company, is intended to fulfill this purpose by allowing the company to minimize the administrative costs associated with litigation, adjudicate claims asserted against the estate in a fair and orderly fashion, and distribute funds to creditors through an orderly plan of liquidation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States that the foregoing is true and correct to the best of my knowledge and belief.

This 15th day of March, 2026.

Amandeep S. Kochar
Chief Executive Officer
Baker & Taylor, LLC