| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1** | |
|---|---|
| **LOWENSTEIN SANDLER LLP**<br>Andrew Behlmann<br>Michael Papandrea<br>One Lowenstein Drive<br>Roseland, New Jersey 07068<br>Telephone: (973) 597-2500<br>Facsimile: (973) 597-2400<br>E-mail: abehlmann@lowenstein.com<br>E-mail: mpapandrea@lowenstein.com<br><br>-and-<br><br>**LOWENSTEIN SANDLER LLP**<br>Bruce S. Nathan (admitted *pro hac vice*)<br>Eric J. Seltzer (admitted *pro hac vice*)<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 262-6700<br>Facsimile: (212) 262-7402<br>E-mail: bnathan@lowenstein.com<br>E-mail: eseltzer@lowenstein.com<br><br>*Counsel to the Official Committee of Unsecured Creditors* | |
| In re:<br><br>BAKER & TAYLOR, LLC,[1]<br>Debtor. | Chapter 11<br><br>Case No. 26-12863 (CMG) |

**NOTICE OF HEARING TO CONSIDER**
**MOTION TO DISALLOW CERTAIN WARN ACT PROOFS OF CLAIM**

**PLEASE TAKE NOTICE** that on **December 1, 2026 at 10:00 a.m. (prevailing Eastern Time)**, counsel for the Official Committee of Unsecured Creditors (the "Committee") shall move before the Honorable Christine M. Gravelle, United States Chief Bankruptcy Judge, at the United States Bankruptcy Court, 402 East State Street, Trenton, New Jersey 08608, Courtroom No. 3, for entry of an order disallowing and expunging certain WARN Act proofs of claim (the "Motion").

[1] The last four digits of the Debtor's federal tax identification number are 9974. The Debtor's principal place of business is 1120 Route 22 East, Bridgewater, New Jersey 08807.

**PLEASE TAKE FURTHER NOTICE** that all papers relating to the Motion can be obtained by contacting the undersigned or by visiting the Debtor's claims and noticing agent at https://omniagentsolutions.com/BakerTaylor-Claims.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion must: must: (a) be in writing; (b) comply with the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the District of New Jersey, and other case management rules or orders of this Court; (c) state with particularity the legal and factual basis for the objection; and (d) be served upon the undersigned counsel, so as to be received no later than **November 24, 2026 at 4:00 p.m. (prevailing Eastern Time).**

**PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed and served, the Motion may be decided on the papers in accordance with D.N.J. LBR 9013-3(d), and the relief requested may be granted without further notice or hearing.

**PLEASE TAKE FURTHER NOTICE** that the undersigned requests oral argument on the return date of the Motion if objections are timely filed.

Dated: October 30, 2026

**LOWENSTEIN SANDLER LLP**

*/s/ Andrew Behlmann*
Andrew Behlmann, Esq.
Michael Papandrea, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Tel: (973) 597-2500
Email: abehlmann@lowenstein.com
Email: mpapandrea@lowenstein.com

-and-

Bruce S. Nathan, Esq. (admitted *pro hac vice*)
Eric J. Seltzer, Esq. (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Email: bnathan@lowenstein.com
Email: eseltzer@lowenstein.com

*Counsel to the Official Committee of Unsecured Creditors*

| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1** | |
|---|---|
| **LOWENSTEIN SANDLER LLP**<br>Andrew Behlmann<br>Michael Papandrea<br>One Lowenstein Drive<br>Roseland, New Jersey 07068<br>Telephone: (973) 597-2500<br>Facsimile: (973) 597-2400<br>E-mail: abehlmann@lowenstein.com<br>E-mail: mpapandrea@lowenstein.com<br><br>-and-<br><br>**LOWENSTEIN SANDLER LLP**<br>Bruce S. Nathan (admitted *pro hac vice*)<br>Eric J. Seltzer (admitted *pro hac vice*)<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 262-6700<br>Facsimile: (212) 262-7402<br>E-mail: bnathan@lowenstein.com<br>E-mail: eseltzer@lowenstein.com<br><br>*Counsel to the Official Committee of Unsecured Creditors* | |
| In re:<br><br>BAKER & TAYLOR, LLC,[1]<br>Debtor. | Chapter 11<br><br>Case No. 26-12863 (CMG) |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DISALLOW CERTAIN WARN ACT PROOFS OF CLAIM

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 case of Baker & Taylor, LLC (the "Debtor"), by and through its undersigned counsel, hereby files this motion (the "Motion") seeking disallowance of Proof of Claim No. 234

[1] The last four digits of the Debtor's federal tax identification number are 9974. The Debtor's principal place of business is 1120 Route 22 East, Bridgewater, New Jersey 08807.

(the "Class Claim") and Proofs of Claim Nos. 4, 5, 6, 7, 235, 236, 237, 238, 239, 240, and 241 (collectively, the "Individual Claims," and together with the Class Claim and all other claims filed or otherwise asserted against the Debtor in connection with Adv. Proc. No. 26-01148-CMG, the "WARN Claims"),[2] each asserting liability for alleged violations of the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109 (the "WARN Act") and the Illinois Worker Adjustment and Retraining Notification Act, 820 ILCS 65 (the "Illinois WARN Act"), and requests entry of an order disallowing and expunging the WARN Claims pursuant to Section 502 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 3007-1 of the Local Rules of the United States Bankruptcy Court, District of New Jersey (the "Local Rules").[3] In support of this Motion, the Committee relies upon the declarations of Amandeep Kochar submitted herewith (the "Kochar Declaration") and filed in connection with the Debtor's bankruptcy petition and first-day pleadings (the "First-Day Declaration") [Docket No. 9] and respectfully represents as follows:

## PRELIMINARY STATEMENT

1. On March 23, 2026, four former Baker & Taylor employees—Kelly Edwards, Raishard Page, Sheryl Martin, and Neli Sujeey Camacho-Perez (collectively, "Plaintiffs")—filed a *Class Action Adversary Proceeding Complaint* against the Debtor (the "Adversary Complaint"), purporting to act on behalf of themselves and a putative class of similarly situated former employees. Adv. Compl. ¶¶ 1, 34. The Adversary Complaint—which is the gravamen of the Class Claim and the Individual Claims—alleges that the Debtor violated the WARN Act and the Illinois

---

2 The claim numbers referenced above refer to the claim numbers assigned by the Debtor's claims and noticing agent, Omni Agent Solutions, Inc. ("Omni")

3 Local Rule 3007-1(a) requires that "[a]n objection to the allowance of a claim must be brought by motion or adversary proceeding."

WARN Act by separating approximately 600 employees from employment on or about October 6, 2025 without providing sixty days' advance notice. Adv. Compl. ¶¶ 11–16, 30.

2. In the seven months since they filed the Adversary Complaint and the Class Claim, Plaintiffs have never sought, let alone obtained, authorization under Bankruptcy Rules 7023 and 9014 to prosecute a claim on behalf of anyone but themselves, and no motion for class certification is pending. Moreover, putative class members received notice of the Bar Date of July 17, 2026 and had a full and fair opportunity to assert their own claims. Permitting the Class Claim to proceed under these circumstances would give claimants who failed to timely pursue their own claims a "second bite at the apple," to the detriment of the estate's other creditors. In addition, at this late stage of the Debtor's bankruptcy case, permitting the Class Claim to proceed threatens to derail the orderly and timely administration of the estate.

3. Independent of the Class Claim defects, the WARN Claims fail on the merits. The uncontroverted record—including the Kochar Declaration and the First-Day Declaration—demonstrates that the Debtor spent the months preceding the October 6, 2025 workforce reduction in an active, well-documented search for financing and an acquirer, culminating in an executed letter of intent with ReaderLink, LLC for a transaction that would have preserved employment for roughly 700 of the Debtor's approximately 950 employees. First-Day Decl. ¶¶ 17, 20–22; Kochar Decl. ¶¶ 6–9. That transaction collapsed only when ReaderLink abruptly withdrew on September 26, 2025, ten days before the layoffs at issue. First-Day Decl. ¶ 23; Kochar Decl. ¶ 10. These facts bring the Debtor squarely within the "faltering company" exception to the WARN Act's notice requirement. *See* 29 U.S.C. § 2102(b)(1).

4. For these reasons, the Committee respectfully requests that the Court disallow and expunge the WARN Claims in their entirety.

## JURISDICTION

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The statutory predicates for the relief requested herein are sections 105(a), 502(b), and 503 of the Bankruptcy Code, Bankruptcy Rules 3007 and 7023, and Local Rule 3007-1.

## FACTUAL BACKGROUND

### A. The Chapter 11 Case.

7. On March 16, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned chapter 11 case (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of New Jersey (the "Court").

8. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its properties as a debtor in possession.

9. No trustee or examiner has been appointed in this Chapter 11 Case.

10. On April 1, 2026, the Office of the United States Trustee appointed the Committee, effective as of that date, pursuant to section 1102(a)(1) of the Bankruptcy Code. *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 50].

11. On August 25, 2026, the Debtor filed the *Chapter 11 Liquidating Plan of Baker & Taylor, LLC* [Docket No. 154] (as modified, amended, or supplemented from time to time, the "Plan"), which provides for the orderly liquidation of the Debtor's assets pursuant to chapter 11 of the Bankruptcy Code. The Committee supports the Plan in its current form.

12. On September 21, 2026, the Debtor filed the *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing Chapter 11 Plan of Liquidation Proposed by the Debtor* [Docket No. 166] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"). Plaintiffs have objected to the adequacy of the Disclosure Statement on various grounds. *See Limited Objection of the Federal WARN Act Claimants to Confirmation of the Chapter 11 Liquidating Plan of Baker & Taylor, LLC and Final Approval of the Disclosure Statement* [Docket No. 174] (the "Disclosure Statement Objection"). The Committee is presently reviewing the Disclosure Statement Objection and intends to take a position on the issues presented therein prior to the hearing on approval of the Disclosure Statement.

**B. The Debtor's liquidity struggles and failed restructuring efforts.**

13. As described in greater detail in the Kochar Declaration and the First-Day Declaration, the Debtor faced a liquidity crisis for several years leading up to the Petition Date. In November 2021, a management group led by Chief Executive Officer Amandeep Kochar acquired the Debtor's business, financing the purchase through a $70 million senior credit facility with CIT Northbridge Funding I, LLC (**"CIT"**). First-Day Decl. ¶¶ 6–7; Kochar Decl. ¶¶ 6–7. A subsequent string of external shocks drained the Debtor's working capital, including a resurgence of the COVID-19 pandemic and two cyberattacks that crippled the Debtor's accounting and technology systems. First-Day Decl. ¶¶ 6–9; Kochar Decl. ¶ 6. By the spring of 2025, CIT had declared the Debtor in default and was exercising discretionary control over the Debtor's cash, refusing to release an $8 million reserve against availability—leaving the Debtor unable to pay its publishers and other suppliers, who began withholding shipments by mid-2025. First-Day Decl. ¶¶ 13–15; Kochar Decl. ¶ 7.

14. Facing this crisis, the Debtor retained Riveron RTS, LLC ("Riveron") as financial advisor in August 2025 and launched a wide-ranging search for new capital, a sale of the business, or—failing those—a plan for an orderly wind-down. First-Day Decl. ¶ 17; Kochar Decl. ¶ 8–9. Working with Riveron, the Debtor contacted 41 potential financing sources, secured expressions of interest from 27 of them, and negotiated term sheets with 5 parties who proceeded to conduct due diligence. First-Day Decl. ¶ 20; Kochar Decl. ¶ 8. Despite this sustained push, none of those discussions produced new financing.

15. At the same time, the Debtor pursued what looked like a lifeline for the business and its employees alike: a sale of substantially all of its assets. On September 6, 2025, the Debtor and ReaderLink, LLC (**"**ReaderLink**"**) executed a letter of intent for a private sale, under which ReaderLink would have hired approximately 700 of the Debtor's roughly 950 employees, with the remainder continuing to provide transition services. First-Day Decl. ¶¶ 21–22; Kochar Decl. ¶ 9. The parties moved quickly, spending the following weeks in diligence and drafting transaction documents toward a closing targeted for September 26, 2025. First-Day Decl. ¶ 22; Kochar Decl. ¶ 9.

16. That lifeline was cut without warning. On the morning of September 26, 2025—the very day that the deal was set to close—ReaderLink abruptly withdrew its offer and rescinded the employment offers that it had extended to the Debtor's employees, leaving the Debtor with no viable path to continue operating at anything close to its existing scale. First-Day Decl. ¶ 23; Kochar Decl. ¶ 10.

### C. The October 6, 2025 workforce reduction.

17. The Debtor's October 6, 2025 workforce reduction was the direct and immediate consequence of ReaderLink's eleventh-hour withdrawal, not a decision that the Debtor made on

its own timeline. With CIT unwilling to fund payroll for a workforce sized for ongoing operations, the Debtor, in consultation with CIT, separated approximately 600 of its 950 employees effective October 6, 2025—just ten days after the ReaderLink transaction fell apart—with further separations to follow in phases through January 23, 2026. First-Day Decl. ¶¶ 24–25; Kochar Decl. ¶ 12.

18. The notice that the Debtor provided to affected employees that day (the "WARN Notice")[4] explained in detail that the parties had been unable to close the ReaderLink transaction after ReaderLink "unexpectedly rescinded" its offers of employment on September 26, 2025, and that the Debtor's leadership, working closely with its advisors and CIT to determine what funding was available to continue operations, had "reached the difficult decision to begin implementing a plan to reduce and ultimately separate its workforce from employment." WARN Notice at 1. The WARN Notice stated that these were "unforeseen events" that made the separations necessary notwithstanding the Debtor's efforts, throughout the preceding difficult period, "to maintain employment for as many personnel as possible," and it represented that the Debtor was "providing the maximum notice possible . . . given the circumstances." *Id.*

19. Even after the layoffs, the Debtor kept looking for a way to salvage what remained of the business. In mid-October 2025, it received a confidential term sheet from a publicly traded strategic buyer interested in a substantial portion of its remaining operations, and Riveron worked to bring major trade creditors on board in support of the deal. That effort, too, ultimately fell short. First-Day Decl. ¶¶ 29–30; Kochar Decl. ¶ 13.

---

[4] A copy of the form of WARN Notice sent to the Debtor's employees is attached to the Kochar Declaration as **Exhibit A**.

### D. The adversary proceeding and proofs of claim.

20. Plaintiffs filed the Adversary Complaint on March 23, 2026, asserting a putative nationwide class under the federal WARN Act covering employees separated at the Debtor's Georgia, North Carolina, and Illinois facilities on or around October 6, 2025 (and within 90 days thereafter), together with an Illinois WARN Act subclass limited to the Illinois facility. Adv. Compl. ¶¶ 1, 34–35. As of the date of this Motion, Plaintiffs have not moved to certify a class in the underlying adversary proceeding.

21. On March 26, 2026, Plaintiffs' counsel filed Proofs of Claim Nos. 4, 5, 6, and 7—each brought "on behalf of" the named Plaintiffs "and those similarly situated" and cross-referencing the Adversary Complaint—asserting amounts of $7,010,383.00 (including $5,260,383.00 in priority wages under 11 U.S.C. § 507(a)(4)).

22. On July 17, 2026—the deadline that this Court established for filing proofs of claim in the Chapter 11 Case (the **"**Bar Date**"**)—the same counsel filed six additional proofs of claim: Proof of Claim No. 234—styled in representative terms and asserting a claim of $8,086,000.00 (including $5,986,000.00 in priority wages under 11 U.S.C. § 507(a)(4)), and Proofs of Claim Nos. 235, 236, 237, 238, 239, 240, and 241—each filed individually by or on behalf of a single named claimant.[5]

## RELIEF REQUESTED

23. By this Motion, the Committee seeks entry of an order, pursuant to section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1, disallowing and expunging the WARN Claims in their entirety.

---

[5] Proofs of Claim Nos. 236, 237, 238, and 241 purport to amend Proofs of Claim Nos. 7, 5, 6, and 4, respectively.

## BASIS FOR RELIEF

24. Section 502(a) of the Bankruptcy Code provides that a filed proof of claim "is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Once an objection is filed, section 502(b) directs the Court to determine the amount of the claim and to allow the claim except to the extent that the claim is unenforceable against the debtor under applicable law or otherwise subject to one of the exceptions enumerated in that section. 11 U.S.C. § 502(b).

25. A proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f). That presumption, however, is rebuttable. Once an objecting party comes forward with evidence sufficient to negate one or more of the allegations essential to the claim's legal sufficiency, the burden shifts to the claimant to prove the validity of the claim by a preponderance of the evidence. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992); *In re Lampe*, 665 F.3d 506, 514 (3d Cir. 2011).

26. As set forth below, the Committee has come forward with more than sufficient evidence to rebut the presumption of validity as to the WARN Claims, both because the Class Claim is procedurally improper and because the WARN Claims fail on the merits under the "faltering company" exception of the WARN Act and the Illinois WARN Act. The burden accordingly rests with Plaintiffs to establish, by a preponderance of the evidence, both their entitlement to proceed on a class basis and the elements of the underlying WARN Claims—a burden which they cannot meet.

### I. The Court should disallow the Class Claim as procedurally improper.

27. Filing a proof of claim as a class representative is not an entitlement automatically available to any putative class plaintiff. Rather, whether to permit class treatment of the claims-

allowance process rests within the sound discretion of the bankruptcy court. *See In re Am. Reserve Corp.*, 840 F.2d 487, 489–92 (7th Cir. 1988); *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 619 (Bankr. S.D.N.Y. 2009). Courts exercise that discretion sparingly, mindful that class treatment can undercut the finality of a claims bar date and add cost and delay to an estate's administration. *In re Sacred Heart Hosp. of Norristown*, 177 B.R. 16, 22 (Bankr. E.D. Pa. 1995).

28. Here, the Class Claim should be disallowed because Plaintiffs (i) never obtained authorization to proceed on a class basis before the Bar Date; (ii) offered no explanation for their delay in seeking certification; and (iii) plainly had notice of the Bar Date. Permitting class treatment now would also burden the administration of the Debtor's estate.

**A. The Class Claim should be disallowed because Plaintiffs never obtained authorization to file a class proof of claim.**

29. As an initial matter, the Class Claim is procedurally defective because Plaintiffs did not request or obtain this Court's permission to file a class claim. A proof of claim may be filed only by the creditor itself, an authorized agent of that creditor, or an indenture trustee. *See* Fed. R. Bankr. P. 3001(b). Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules") does not apply of its own force to the claims allowance process: because that process is governed by the contested-matter rules of Bankruptcy Rule 9014, Bankruptcy Rule 7023 (which incorporates Federal Rule 23) applies only upon order of the bankruptcy court. Fed. R. Bankr. P. 9014(c); *In re Am. Reserve Corp.*, 840 F.2d at 488; *In re Ephedra Prod. Liab. Litig.*, 329 B.R. 1, 5 (S.D.N.Y. 2005).

30. Accordingly, courts have required putative class claimants to obtain an order extending Bankruptcy Rule 7023 to the claims resolution process before a class proof of claim may proceed. See *In re Circuit City Stores, Inc.*, 2010 WL 2208014, at *3–5 (Bankr. E.D. Va. May 28, 2010), *aff'd*, 2010 WL 4481781 (E.D. Va. Oct. 29, 2010), *aff'd in part on other grounds sub*

*nom. Gentry v. Siegel*, 668 F.3d 83 (4th Cir. 2012); *In re Computer Learning Centers, Inc.*, 344 B.R. 79, 86–87 (Bankr. E.D. Va. 2006) ("The applicability of Rule 7023 is raised by motion . . . [T]he proponent of the class proof of claim must seek and must obtain application of Rule 7023 . . . [W]ithout that order, Rule 7023 is not applicable to the proof of claim and a class proof of claim is improper."); *Reid v. White Motor Corp.*, 886 F.2d 1462, 1470–71 (6th Cir. 1989) (finding that a class proof of claim was not proper without an order making Bankruptcy Rule 7023 applicable).

31. No such order exists here. Plaintiffs never moved for, and this Court never granted, authorization under Bankruptcy Rules 9014 and 7023 to pursue claims on a class basis, and the Bar Date has since passed. *See Trump Taj Mahal Assocs. v. Alibraham* (*In re Trump Taj Mahal Assocs.*), 156 B.R. 928 (Bankr. D.N.J. 1993) ("The well-established law of this Circuit is also that bar dates for filing Proofs of Claim are strictly construed."). The Class Claim is therefore procedurally improper and should be disallowed on this basis alone.

**B. Even if proper authorization was sought, the Court should exercise its discretion not to extend Federal Rule 23 to the Claims Process.**

32. Even assuming that a timely motion to apply Federal Rule 7023 had been made, the decision whether to grant such motion remains committed to the Court's discretion. *In re Tarragon Corp.*, No. 09-10555-DHS, 2010 WL 3842409, at *3 (Bankr. D.N.J. Sept. 24, 2010) ("In determining whether or not to make 7023 applicable, the court may exercise its sound discretion") (citing *Reid*, 886 F.2d at 1470 ("Rule 9014 delegates wide discretion to the bankruptcy judge in construing certification of class proofs of claim pursuant to Rule 7023 in a contested matter.")).

33. Courts weigh several factors in exercising that discretion, including (i) whether the class was certified before the petition date, (ii) whether putative class members received notice of the bar date, (iii) whether extending Federal Rule 23 would disrupt administration of the estate, and (iv) whether the claimant unreasonably delayed in seeking class certification. *In re Musicland*

*Holding Corp.*, 362 B.R. 644, 654 (Bankr. S.D.N.Y. 2007); *In re Chaparral Energy, Inc.*, 571 B.R. 642, 646 (Bankr. D. Del. 2017); *Tarragon*, 2010 WL 3842409, at *3. Each of these considerations weigh against class treatment here.

**i. *The class was not certified prior to the Petition Date.***

34. Whether the putative class was certified before the petition date is a threshold consideration in deciding whether to extend Federal Rule 23 to a proof of claim, and, together with notice of the bar date, one of the two considerations that courts treat as "critical." *Musicland*, 362 B.R. at 655. Classes certified before the petition date are the "best candidates" for a class proof of claim. *Id.* at 654 (citing *Sacred Heart*, 177 B.R. at 22). A class that was never certified carries no such presumptive legitimacy into the bankruptcy case. *See id.* (citing *In re Craft*, 321 B.R. 189, 198 (Bankr. N.D. Tex. 2005) (if a class has not been certified, the court faces different issues)).

35. The absence of prepetition certification also determines what putative class members could reasonably expect. Where no class was certified before the petition date, "no putative class member should or could have had a reasonable expectation that they did not have to comply with the bar date." *Musicland*, 362 B.R. at 656 (citing *Bailey v. Jamesway Corp. (In re Jamesway Corp.)*, No. 95 B 44821, 1997 WL 327105, at *10 (Bankr. S.D.N.Y. June 12, 1997)). For that reason, putative members of an uncertified class who received actual notice of the bar date but did not file timely proofs of claim are "the least favored candidates for class action treatment." *Id.* at 655.

36. Courts have applied this principle specifically to putative classes of former employees asserting WARN Act claims. In *Sacred Heart*, no class was certified prepetition, and the court denied a motion to prosecute a WARN Act class proof of claim on behalf of the debtor's former employees. *See Musicland*, 362 B.R. at 655 (discussing *Sacred Heart*, 177 B.R. at 18–24).

In *Jamesway*, the putative class of WARN Act claimants commenced its class action one day before the bankruptcy and was never certified; the court denied certification without even reaching whether the movants satisfied Rule 23. *Id.* at 655–56 (discussing *Jamesway*, 1997 WL 327105, at *10). And in *Musicland* itself, because the putative class of former employees "was not certified pre-petition," its members "did not have a reasonable expectation that a class claim would be filed that would protect their rights, or that they did not have to comply with the bar date," and the court declined to extend Rule 23. *Id.* at 656–57.

37. Plaintiffs here are in a weaker position than the claimants in any of those cases. The WARN Claims arise from separations that took effect on or about October 6, 2025, more than five months before the Petition Date. Yet, no class action of any kind was pending against the Debtor on the Petition Date. Indeed, Plaintiffs did not file the Adversary Complaint until March 23, 2026, a week after the Debtor sought chapter 11 relief. No class has been certified since, and Plaintiffs have not even moved for certification. Whereas the claimants in *Musicland* and *Jamesway* had at least commenced class actions before the petition date, *see Musicland*, 362 B.R. at 647, 655, no court had taken any step toward class treatment before the Petition Date, and none has done so since.

38. Nor can Plaintiffs avoid this factor by arguing that their class could not have been certified before the Petition Date. The WARN Claims rest entirely on prepetition conduct—the October 6, 2025 separations—and nothing prevented Plaintiffs from filing suit and seeking certification in the more than five months between those separations and the Petition Date. In any event, the factor exists to protect the reasonable expectations of putative class members, and absent a certified class no such expectation could arise, regardless of why certification never occurred. *See Musicland*, 362 B.R. at 656.

39. Accordingly, no putative class member had any basis to believe that a certified class, or even a pending class action, would protect his or her rights in this Chapter 11 Case, and each was obligated to comply with the Bar Date like any other creditor. *See id.* This factor weighs decisively against extending Federal Rule 23 to the Class Claim.

**ii. *Plaintiffs delayed in seeking class certification without justification.***

40. Requests to apply Federal Rule 23 must be made without undue delay because class proceedings—unlike the streamlined contested-matter process ordinarily used to resolve claims—cannot easily be squeezed into the compressed timeline of a bankruptcy case. *In re Tarragon Corp.*, 2010 WL 3842409, at *5 (stating that the inexcusable delay in seeking to certify a class "would be wholly inconsistent with the efficiency goals of the Bankruptcy Code"); *see also In re Ephedra Prod. Liab. Litig.*, 329 B.R. at 5.

41. Plaintiffs offer no such urgency here. Despite commencing the Adversary Proceeding on March 23, 2026—almost six months ago—Plaintiffs have not yet moved to certify a class. Nothing in the record explains this delay, and it weighs heavily against extending Federal Rule 23 to the claims process.

**iii. *Plaintiffs received notice of the Bar Date.***

42. To the Committee's knowledge, all putative class members received actual notice of the Bar Date. They were included on the Debtor's schedules and mailing matrix and the Omni served notice of the Bar Date on all current and former employees. Having received notice, each putative class member had a full and fair opportunity to file an individual proof of claim. Yet, to the Committee's knowledge, no members of the putative class did so other than the five Plaintiffs for whom Plaintiffs' counsel filed proofs of claim.

43. Where, as here, putative class members received adequate notice of the bar date but did not file timely claims, they are "the least favored candidates for class action treatment." *In re Musicland Holding Corp.*, 362 B.R. 644, 655 (Bankr. S.D.N.Y. 2007). Permitting a class claim to proceed in these circumstances would "effectively extend the bar date for those [putative class members] who failed to file a timely claim, without a showing of excusable neglect." *Id.* at 655–56; *accord In re W.R. Grace & Co.*, 389 B.R. 373, 380 (Bankr. D. Del. 2008) (refusing to permit a class claim where putative class members received notice of the bar date). As the court explained in *In re Sacred Heart Hospital of Norristown*, "[t]inkering with an established bar date" in these circumstances "gives late filers a second bite at an apple which is likely to be less than fully satisfying, . . . effect[ing] unfair diminution of the timely filer's share of a distribution" and "may itself violate due process." 177 B.R. 16, 23 (Bankr. E.D. Pa. 1995). Class treatment is therefore unnecessary—and would be inequitable—as to those who received notice of the Bar Date and simply chose not to act.

**iv. *Class treatment would disrupt administration of the estate.***

44. Courts decline to extend Federal Rule 23 to the claims process where doing so would "gum up" the administration of the estate. *In re Connaught Grp., Ltd.*, 491 B.R. 88, 98 (Bankr. S.D.N.Y. 2013) ("[T]he principal consideration must be the effect of the class certification on the administration of the estate."); *see also In re Am. Reserve Corp.*, 840 F.2d at 491; *Musicland*, 362 B.R. at 656–57; *Tarragon*, 2010 WL 3842409, at *4. The primary purpose of this Chapter 11 Case is to wind down and liquidate the Debtor's remaining assets in an orderly fashion. Layering class discovery, certification briefing, and a class-wide claims resolution process onto that effort—for the benefit of a class that has not even moved for certification—would consume estate resources that should instead be preserved for distribution to creditors generally.

45. The Class Claim asserts millions of dollars in alleged WARN liability. Although the Debtor and the Committee dispute liability, litigating the merits of the Class Claim to final resolution—including any contested motion for class certification—could take considerable time, delaying recovery to the Debtor's other creditors who have waited patiently while the estate's limited remaining assets are administered. Permitting the Class Claim to proceed at this stage, months after the Bar Date and without any motion for certification ever having been filed, would create exactly the sort of "massive problems" for the "prompt and orderly distribution of the estate" that courts have consistently refused to support. *In re Ephedra Prod. Liab. Litig.*, 329 B.R. 1, 8 (S.D.N.Y. 2005); *see also Musicland*, 362 B.R. at 656–57; *Tarragon*, 2010 WL 3842409, at *4–5; *Sacred Heart*, 177 B.R. at 22–23.

46. For these reasons, none of the discretionary factors favor extending Federal Rule 23 to the claims process, and each independently supports disallowance of the Class Claim. The Court should decline to extend Federal Rule 23 and disallow the Class Claim in its entirety.

## II. **The WARN Claims fail on the merits.**

47. Even setting aside these procedural defects, the Class Claim and the Individual Claims alike fail on the merits, as the WARN Act's faltering company exception relieves the Debtor of any obligation to have given 60 days' advance notice of the October 2025 workforce reduction.

48. The WARN Act and its state analogs generally call for 60 days' advance written notice of a covered layoff or closing and create a civil cause of action against employers for back pay and benefits for each day of a violation, subject to reductions for the employer's payment of wages, contributions (such as for health benefits or pensions) on the employee's behalf, or the employer's voluntary payments to employees. *See* 29 U.S.C. §§ 2102(a), 2104(a). However, that requirement does not operate as an inflexible rule that punishes employers for trying to save their

businesses. To the contrary, courts have long recognized that the statute provides employers with "leeway" to exercise reasonable business judgment when confronting financial distress, *In re AE Liquidation, Inc.*, 556 B.R. 609, 618 (D. Del. 2016), *aff'd*, 866 F.3d 515 (3d Cir. 2017), and that penalizing good-faith efforts to preserve a company and its jobs would run counter to the statute's purpose, *In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013).

49. That principle applies with full force here. In the months before the October 6, 2025 workforce reduction, the Debtor pursued—simultaneously and in good faith—a sale of the company and multiple avenues of new financing, any one of which, if successful, would have preserved employment for most of its workforce. First-Day Decl. ¶¶ 17, 20–22; Kochar Decl. ¶ 8. Under these circumstances, requiring 60 days' advance notice would not have protected employees; it would only have guaranteed the very outcome that the Debtor was attempting to avoid.

### A. The faltering company exception excuses the Debtor's compliance with the WARN Act's notice requirement.

50. The WARN Act excuses an employer from the ordinary notice requirement where, "as of the time that notice would have been required[,] the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business." 29 U.S.C. § 2102(b)(1). This is known as the "faltering company" exception.

51. To invoke the faltering company exception, the Third Circuit requires a showing that the employer (i) was actively seeking capital or business as of the date notice would otherwise have been due; (ii) had a realistic chance of obtaining it; (iii) would have avoided or postponed the shutdown had it succeeded; and (iv) reasonably and in good faith believed that giving notice would

have undermined those efforts. *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 246–47 (3d Cir. 2008); *see also* 20 C.F.R. § 639.9(a)(1) (defining "actively seeking capital or business" to include pursuing financing, refinancing, loans, or "additional money, credit or business through any other commercially reasonable method"). A district court in this circuit recently applied this same framework to affirm disallowance of WARN Act claims on closely comparable facts, holding that a debtor's active—if ultimately unsuccessful—efforts through its investment bank to secure new financing and a sale in the weeks before a sudden business collapse satisfied the exception. *Int'l Bhd. of Teamsters v. Yellow Corp.*, Civ. Nos. 25-307-JLH & 25-377-JLH, slip op. at 10–17 (D. Del. June 29, 2026). Each of these four elements is also satisfied here.

**i. *The Debtor was actively seeking capital and business.***

52. The Debtor's search for capital and a sale transaction was neither passive nor sporadic. Beginning in August 2025—squarely within the window where notice would otherwise have been due—the Debtor engaged Riveron and, working together, contacted 41 potential sources of financing, received expressions of interest from 27 of them, and negotiated term sheets with 5 parties who conducted due diligence. First-Day Decl. ¶ 20; Kochar Decl. ¶ 8. At the same time, the Debtor pursued a sale of the business, executing the ReaderLink letter of intent on September 6, 2025 and proceeding through weeks of diligence and document negotiation. First-Day Decl. ¶¶ 21–22; Kochar Decl. ¶ 9.

53. This is not a case where an employer sat on its hands while its options expired. *Cf. APA Transp.*, 541 F.3d at 249. The Debtor retained professional advisors, canvassed dozens of counterparties, executed multiple term sheets, and reached a signed letter of intent for a transaction that would have kept most of its workforce employed—efforts that continued without pause through the period when notice would otherwise have been required. First-Day Decl. ¶¶ 17, 20–

23; Kochar Decl. ¶ 8. That these efforts ultimately came up short does not undermine the analysis. As the Delaware District Court recently confirmed in affirming a similar disallowance of WARN Act claims, an employer satisfies this element where its financial advisor was "actively engaged in efforts to identify potential sources of new capital" until a sudden business collapse rendered those efforts futile, "even if those efforts were ultimately unsuccessful." *Int'l Bhd. of Teamsters v. Yellow Corp.*, slip op. at 12 (quoting *In re Yellow Corp.*, 2024 WL 5181660, at *10–11 (Bankr. D. Del. Dec. 19, 2024)). The same holds true for Baker & Taylor's efforts with Riveron and ReaderLink, which continued until ReaderLink's unexpected, last-minute withdrawal.

**ii. *The Debtor had a realistic opportunity to obtain the financing or sale that it sought.***

54. The Debtor's opportunity to complete the ReaderLink transaction, or to obtain alternative financing, was concrete—not speculative. The ReaderLink letter of intent was a signed, binding commitment to negotiate toward a closing, not a preliminary inquiry. First-Day Decl. ¶ 22. The parties conducted extensive diligence, exchanged drafts of transaction documents, and were working toward a September 26, 2025 closing date. *Id.* Had ReaderLink not withdrawn that very morning, the transaction was positioned to close on schedule, preserving jobs for roughly 700 of the Debtor's approximately 950 employees. First-Day Decl. ¶¶ 22–23; Kochar Decl. ¶ 9.

55. The Debtor's broader financing search corroborates that this opportunity was real: five separate counterparties executed term sheets and undertook due diligence, not merely preliminary conversations. First-Day Decl. ¶ 20; Kochar Decl. ¶ 8; *see In re Old Electralloy Corp.*, 162 B.R. 121, 125–26 (Bankr. W.D. Pa. 1993) (a reasonable prospect of securing new financing or investment makes it unreasonable to expect 60 days' notice, since notice would foreclose the very possibility of remaining open). Even after ReaderLink walked away, the market's continued interest in the Debtor's assets was confirmed when the Debtor received a confidential term sheet

from a publicly traded strategic buyer in mid-October 2025. First-Day Decl. ¶¶ 29–30; Kochar Decl. ¶ 13.

56. Nor is this conclusion undermined by how quickly matters unraveled once ReaderLink withdrew. Indeed, the Delaware District Court squarely rejected the notion that a "near impossibility" of obtaining financing in the days immediately before a shutdown defeats this element, explaining that "every company that shuts down presumably did so because of its ultimate inability to obtain additional financing just before making the decision to shut down." *Int'l Bhd. of Teamsters v. Yellow Corp.*, slip op. at 13. The same reasoning applies here.

**iii. *The financing or sale would have postponed the shutdown.***

57. The WARN Act asks only whether the sought-after financing or transaction would have been sufficient to avoid *or postpone* the shutdown—not necessarily to prevent it forever. *APA Transp.*, 541 F.3d at 246–47. Consummation of the ReaderLink transaction, which contemplated ReaderLink employing approximately 700 of the Debtor's roughly 950 employees, would have done far more than merely postpone the October 2025 layoffs—it would have averted them altogether for the substantial majority of the workforce. First-Day Decl. ¶ 22; Kochar Decl. ¶ 9. The five outstanding financing term sheets likewise represented capital infusions that would have extended the Debtor's operating runway while a longer-term solution was pursued. First-Day Decl. ¶ 20; Kochar Decl. ¶ 8.

**iv. *Providing 60 days' advance notice would have precluded the Debtor from obtaining the capital or business that it sought.***

58. The Debtor's belief that early notice would have derailed its efforts to secure financing or close a sale was both reasonable and held in good faith. Announcing a mass layoff in early August 2025—precisely when the Debtor was negotiating with ReaderLink and courting

dozens of financing sources—would have signaled to every counterparty at the table that the company's future was already decided.

59. Publicizing an impending shutdown would have driven customers to competitors, further eroding the revenue and receivables base that made the Debtor an attractive acquisition target and financing prospect in the first place. It would have given ReaderLink and other prospective counterparties every reason to walk away early rather than complete diligence. And it would have accelerated the very attrition of skilled employees needed to keep the business operating through a transition—undermining the value of the enterprise that ReaderLink and other suitors were negotiating to acquire.

60. Courts recognize the practical reality reflected in these facts: "[a]s long as [a] [d]ebtor's management had a reasonable prospect of securing either additional loan money or a capital investment, it is unreasonable to expect a 60 day notice of plant closing to have been given, since that would have foreclosed the possibility of staying open." *In re Old Electralloy Corp.*, 162 B.R. at 125–26. The Debtor's prospects were more than reasonable—they were embodied in an *executed letter of intent* and five active financing term sheets. First-Day Decl. ¶¶ 20–22; Kochar Decl. ¶ 8–9. Providing WARN notice in the midst of those negotiations would have been self-defeating.

61. Because each element of the faltering company exception is satisfied, Baker & Taylor had no obligation to provide 60 days' advance notice, and the WARN Claims should be disallowed on this independent basis.

**B. The Debtor's WARN Notice satisfies all of the requirements for the faltering company exception to apply.**

62. An employer relying on the faltering company exception must, in addition to satisfying the exception's substantive elements, "give as much notice as is practicable and at that

time . . . give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3); *see also* 20 C.F.R. § 639.7(d) (further discussing the content of a WARN notice). The Debtor's WARN Notice satisfies both of these requirements.

63. First, the Debtor's WARN Notice satisfies the timing requirement. "As much notice as is practicable" does not require instantaneous notice; courts have repeatedly upheld notices given days after the triggering event where the delay is attributable to the scale of the workforce and the abruptness of the shutdown. *See Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 719 (D.S.C. 2021) (notices issued four to ten days after layoffs were "as soon as practicable" given "the presence of thousands of workers at the job site, and the abrupt nature of the shutdown"); *see also In re AE Liquidation, Inc.*, 866 F.3d 515, 524–25 (3d Cir. 2017) (five-day after-the-fact notice was "as much notice as practicable under the circumstances, even if it was after the fact"); *In re Old Electralloy Corp.*, 162 B.R. 121, 126 (Bankr. W.D. Pa. 1993) (notice given on the day of the layoff was sufficient).

64. Here, ReaderLink's rescission of its employment offers on September 26, 2025 gave Baker & Taylor no advance warning that the transaction underpinning its continued operations at anything close to full scale was about to collapse. First-Day Decl. ¶ 23; Kochar Decl. ¶ 10. In the ten days that followed—a delay squarely within the range the *Butler* court found reasonable—the Debtor assessed the sudden loss of its principal rescue transaction, consulted with CIT regarding what funding remained available, and determined the scope and phasing of the resulting workforce reduction across its facilities before issuing the WARN Notice on October 6, 2025, the very day that the affected separations took effect. First-Day Decl. ¶¶ 24–25; Kochar Decl. ¶¶ 16–17; WARN Notice at 1. Just as the shutdown in *Butler* involved a large number of workers, the Debtor needed to assess and coordinate separations affecting approximately 600

employees before it could responsibly issue notice—and did so well within the outer bound that the *Butler* court approved. The Debtor thus provided "as much notice as is practicable" under the circumstances.

65. Second, the WARN Notice satisfies the statute's separate requirement that the accompanying brief statement articulate the basis for the reduced notice period. It explains that the parties had been unable to close the ReaderLink transaction after ReaderLink "unexpectedly rescinded" its offers of employment on September 26, 2025, and that the Debtor's leadership, working closely with its advisors and in consultation with CIT to determine what funding was available to continue operations, had "reached the difficult decision to begin implementing a plan to reduce and ultimately separate its workforce from employment." WARN Notice at 1. The WARN Notice further explains that these were "unforeseen events" that made the separations necessary notwithstanding the Debtor's efforts "to maintain employment for as many personnel as possible," and it represented that the Debtor was "providing the maximum notice possible . . . given the circumstances." *Id.*

66. This is precisely the kind of employer-specific detail—identifying the failed transaction, the lender consultation, and the timeline of events—that courts have found sufficient to "assist employees in understand[ing] the employer's situation and its reasons for shortening the notice period," rather than a bare recitation of statutory language. *Int'l Bhd. of Teamsters v. Yellow Corp.*, slip op. at 14 (quoting *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389 (9th Cir. 1994)). Just as the notice at issue in the *Yellow* appeal was held sufficient because it identified the exception being invoked and explained that the company had hoped to complete a transaction and secure funds or business to avoid the shutdown but was unable to do so, the WARN Notice here likewise

identifies the specific transaction that the Debtor had pursued, the reason it fell through, and the resulting necessity of the workforce reduction—satisfying the statute's notice-content requirement.

67. Accordingly, the WARN Notice satisfies both requirements that the statute imposes on an employer invoking the faltering company exception—the timing of the notice and the content of the accompanying explanation—providing an independent basis, alongside satisfaction of the exception's substantive elements, for disallowing the WARN Claims.

**C. The Illinois WARN Act claims fail for the same reasons.**

68. The Illinois WARN Act is explicitly modeled after the WARN Act and should be "interpreted in a manner consistent with the federal [statute] and the federal regulations and court decisions interpreting that [a]ct to the extent that the provisions of federal and [s]tate law are the same." 820 ILCS 65/55; *see also Mitchell v. Murray Energy Corp.*, No. 17-CV-444-NJR-RJD, 2019 WL 718521, at *1 (S.D. Ill. Feb. 20, 2019) (finding that the Illinois WARN Act "substantively parallels the WARN Act"). The Illinois WARN Act contains a substantially similar faltering company exception, and nothing in that statute calls for a different result. *See* 820 ILCS 65/15(a)(1) (for the faltering company exception to apply, (i) the employer must "actively be seeking capital or business" at the time that notice of the layoff would have been required; (ii) "the capital or business sought, if obtained, would have enabled the employer to avoid or postpone the relocation or termination; and (iii) the employer must have "reasonably and in good faith believed that giving the notice . . . would have precluded the employer from obtaining the needed capital or business"). Moreover, the employer must "provide as much notice as practicable and at the time shall provide a brief statement of the basis for reducing the notification period." *Id.* at 65/15(d).

69. For the reasons discussed above, the Debtor satisfies the faltering company exception under the WARN Act. Given that the Illinois WARN Act contains a faltering company

exception that mirrors the WARN Act, the same analysis applies with equal force to the asserted Illinois WARN Act claims. Specifically, the Debtor was "actively . . . seeking capital or business" throughout the relevant period—engaging Riveron, contacting 41 potential financing sources, negotiating term sheets with 5, and executing a letter of intent with ReaderLink for a transaction that would have preserved roughly 700 jobs. First-Day Decl. ¶¶ 17, 20–22; Kochar Decl. ¶ 8–9. That transaction, together with the outstanding financing term sheets, "would have enabled the employer to avoid or postpone" the workforce reduction. First-Day Decl. ¶¶ 20, 22. The Debtor "reasonably and in good faith believed that giving the notice . . . would have precluded the employer from obtaining the needed capital or business," as announcing a mass layoff while negotiating with ReaderLink and dozens of financing sources would have signaled to counterparties that the company's future was already decided, driven customers to competitors, and accelerated employee attrition—undermining the value those suitors sought to acquire. Finally, the WARN Notice satisfied the statute's requirement to provide "as much notice as practicable" and a "brief statement of the basis for reducing the notification period" by identifying the failed ReaderLink transaction, the lender consultation, and the timeline of events. *See* WARN Notice at 1

70. Because each element of the Illinois WARN Act's faltering company exception is satisfied for the same reasons that establish the federal faltering company defense, the asserted Illinois WARN Act claims should likewise be disallowed.

**<u>RESERVATION OF RIGHTS</u>**

71. The Committee expressly reserves all rights, claims, and defenses with respect to the WARN Claims, the Adversary Complaint, and the putative class, including without limitation the right to: (i) challenge class certification under Federal Rule 23; (ii) assert additional substantive

and procedural defenses to the WARN Act and Illinois WARN Act claims; (iii) challenge the amount, priority, or secured status of the WARN Claims; and (iv) raise any and all objections to the WARN Claims that may become available. Nothing in this Motion shall be deemed a waiver of any such rights.

## **WAIVER OF MEMORANDUM OF LAW**

72. The Committee respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3) because the legal basis upon which the Committee relies is incorporated herein and the Motion does not raise any novel issues of law.

## **NOTICE**

73. Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of New Jersey; (ii) counsel for the Debtor; (iii) counsel to Plaintiffs; and (iv) all parties that have requested to receive notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Committee respectfully submits that no other or further notice is required.

## **NO PRIOR REQUEST**

74. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, the Committee respectfully requests that this Court enter an order: (i) granting this Motion; (ii) disallowing and expunging the Class Claim in its entirety; (iii) disallowing and expunging the Individual Claims in their entirety; and (iv) granting such other and further relief as the Court deems just and proper.

Dated: October 30, 2026

**LOWENSTEIN SANDLER LLP**

*/s/ Andrew Behlmann*
Andrew Behlmann, Esq.
Michael Papandrea, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Tel: (973) 597-2500
Email: abehlmann@lowenstein.com
Email: mpapandrea@lowenstein.com

-and-

Bruce S. Nathan, Esq. (admitted *pro hac vice*)
Eric J. Seltzer, Esq. (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Email: bnathan@lowenstein.com
Email: eseltzer@lowenstein.com

*Counsel to the Official Committee of Unsecured Creditors*